WODILL and another, Plaintiffs, vs. SULLIVAN (James) and others, Defendants.  [Case No. 11.]*

SULLIVAN (Henry), Plaintiff, vs. HARTFORD ACCIDENT & INDEMNITY COMPANY and another, Defendants.  [Case No. 12.]*

*September 13—October 11, 1955.*

* Motions for rehearing denied, with $25 costs, on December 6, 1955.

592

Case No. 11:

For the plaintiffs Wodill there was a brief by *Lueck, Skupniewitz & Lueck* of Beaver Dam, and oral argument by *Arthur W. Lueck*.

For the defendant James Sullivan there was a brief by *Callahan & Arnold* of Columbus, and oral argument by *Carroll B. Callahan* and *E. Clarke Arnold*.

For the defendants Violet Olson and Hartford Accident & Indemnity Company there was a brief by *Toebaas, Hart, Kraege & Jackman* of Madison, and oral argument by *W. L. Jackman*.

Case No. 12:

For the plaintiff Henry Sullivan there was a brief by *Callahan & Arnold* of Columbus, and oral argument by *Carroll B. Callahan* and *E. Clarke Arnold*.

For the defendants there was a brief by *Toebaas, Hart, Kraege & Jackman* of Madison, and oral argument by *W. L. Jackman*.

FAIRCHILD, C. J.  The accident occurred on August 3, 1952, at about 10:30 p. m., on Highway 33 at a point east of Beaver Dam, between what is known as a county park and "Danny's Steak House." The cars involved were traveling in an easterly direction. Beginning at the county park and extending easterly, the road inclines upward, the rise being about 1.6 per cent. In the vicinity of the accident the road is a 22-foot black-top, with a white center line and "no passing" stripes. About 193 feet to the east of the crest of the hill and just off the south side of the highway is the west entrance to "Danny's Steak House." The decline from the crest of the hill to the west entrance involves a drop of 1.7 feet in a distance of 193 feet, or a decline of about .9 per cent.

A Plymouth sedan owned by respondent Henry Sullivan was being driven in an easterly direction by his son James Sullivan, who had as passengers respondent Robert L. Wodill and one Dale Hendricks. Somewhere between the base of the hill and the middle of the hill the Plymouth passed a car going in the same direction. When the Plymouth recovered its own lane, it was then following a Cadillac owned by Violet Olson and being driven by Stanley B. Kasiewicz. The Cadillac was slowing down preparatory to making a right-hand turn south into the west entrance to the steak house, about 230 feet ahead. The Plymouth gained steadily on the Cadillac until the distance between the two cars was closed to from 50 to 75 feet. Then the Plymouth, without decreasing

its speed, turned left to get around the Cadillac, collided with the left rear corner of the Cadillac, hit the mailbox on the north side of the road at a point about 40 feet west of the crest, and after rolling over several times came to a stop in a ditch on the north side of the road at a point about 40 feet west of the west entrance to the steak house, a distance of about 183 feet from the mailbox which it knocked down after colliding with the Cadillac. No skid marks were found on the pavement.

Kasiewicz, the driver of the Olson car, and Violet Olson, the owner, both testified that the brakes of the Cadillac were not applied. Mr. Kasiewicz stated that he had started to decelerate the car at the base of the hill, and that he was holding his foot just over the brake pedal preparatory to using the brake as he neared the west entrance to "Danny's Steak House." At the time of the collision, the Cadillac was still some 230 feet from the west entrance, or 130 feet from a point ahead at which he would be required to give a turn signal. (Sec. 85.175 (2), Stats.)

Robert L. Wodill, one of the plaintiffs and a respondent, testified that the Plymouth had passed another car near the county park and was about 800–900 feet behind the Cadillac when he first saw it; that both cars were going at that time about 50 miles per hour; that the Plymouth gradually gained on the Cadillac and closed up the distance between the cars to 50–75 feet; that the Cadillac suddenly decreased its speed; but that the brake lights did not go on.

Dale Hendricks, a passenger in the Plymouth, stated that the Plymouth passed the first car on the hill; that when the Plymouth had regained its proper lane it was only 300 feet behind the Cadillac; that the distance between the two cars was gradually closed up to about 75 feet; and that all of a sudden the Olson car greatly reduced its speed. He also testified that the brake lights did not go on.

It is the contention of the respondents that there was a sudden and great reduction of speed by the Olson car; and that the driver was negligent in not giving an appropriate signal. The question immediately before us, then, is: Was there a sudden decrease in the speed of the Olson vehicle? If there was no sudden decrease such as is contemplated by the law, then there was no violation of the statutes requiring signals and no negligence on the part of the driver of the Cadillac.

It is not disputed that, in compliance with secs. 85.06 (1) (h) and 85.06 (6), Stats., the Cadillac was equipped with brake lights activated by the foot brake, and that they were in working order. It was established by the evidence that the brake was not applied. Therefore any change in speed in the Olson car could have resulted only from the driver's taking his foot off the accelerator. Officer Ray Butler, who made a plat of the territory near the scene of the accident, testified that in a distance of 850 feet the rise is only 13.27 feet, that the road is straight and the incline uniform. The only conclusion to be drawn from those physical facts is that the mere release of the accelerator of a vehicle traveling at a speed of 50 miles per hour up a gradual slope could not result in a sudden decrease in speed within the meaning of the statute.

Sec. 85.06 (1) (h), Stats., defines a "stop lamp" as a "device giving a steady warning light to the rear of a vehicle to indicate the intention of the driver of a vehicle to diminish speed or stop." Sec. 85.06 (6) states that "Every motor vehicle in use upon a highway shall be equipped with a stop lamp on the rear, . . . which shall be activated upon application of the service or foot brake." Sec. 85.175 (3) provides that "No person shall stop or suddenly decrease the speed of a vehicle without first giving an appropriate signal in the manner provided in sections 85.176 and 85.177 to the driver of any vehicle immediately to the rear when there is opportunity to give such signal."

Sec. 85.176, Stats., referred to in sec. 85.175 (3), reads: "Any stop or turn signal when required herein shall be given *either* by means of the hand and arm *or* by a signal lamp or lamps or mechanical signal device of a type approved by the department, but when a vehicle is so constructed or loaded that a hand-and-arm signal would not be visible both to the front and rear of such vehicle then said signals must be given by such lamp or lamps or signal device."

It is clear from a reading of secs. 85.06 (1) (h) and 85.06 (6), Stats., that the brake-activated stop lamp required as a part of the equipment of all vehicles is a "signal device of a type approved by the department." Sec. 85.176 in no way restricts its use. The use of the correlative conjunction "either . . . or" in that section signifies alternative methods of giving stop or turn signals, one of these being the use of the hand-and-arm signal. It further provides that when use of the hand-and-arm signal is not feasible, then the lamp or signal devices *must* be used. Respondents' contention that the requirement of sec. 85.175 (3) that an appropriate signal must be given "first" before stopping or suddenly reducing speed cannot logically be deduced from a reading of the statutes. The use of the word "first" in sec. 85.175 (3), if interpreted literally, would apply to all of the alternative methods allowed in sec. 85.176, including the arm-and-hand signal. It would be absurd to require an arm-and-hand signal "first" before giving an arm-and-hand signal to indicate the driver's intention. It is just as unreasonable to require an arm-and-hand signal "first" before signaling with the stop lamp, the very purpose of which is to indicate the driver's intention to stop or diminish speed; or before using directional signals, the very purpose of which is to indicate the driver's intention to turn. If it were required that an arm-and-hand signal be given "first," then such signal would signify the driver's intention, and the requirement of a mechanical device such as a stop lamp would be meaningless.

Furthermore, the only requirement in the statutes fixing a distance in which a driver of a vehicle must indicate by signal his intention relates to turning, and there the statute requires that such signal be given 100 feet before turning. If the legislature had intended that a hand-and-arm signal had to be given before using the brakes or directional signals, or other mechanical devices, in order to make the law workable, it would have had to fix a distance at which such previous warning would have to be given, as it did in the matter of turning.

When a vehicle is equipped with brake-activated stop lights as required by statute, as soon as pressure is applied to the brakes, a signal automatically occurs indicating the driver's intention to stop or diminish speed. No other signal is required by law.

In the present case no signal whatever was required. The speed of a vehicle, the suddenness with which the brake is applied, and the force of the application may result in a complete "stop," or it may result in "suddenly decreasing" the speed. The danger to traffic in the rear is the same in either case, and the statutes have provided the same safety measures in either case. The mere releasing of the accelerator, however, does not present a similar hazard. The following driver has a statutory duty to maintain a proper and safe distance behind the leading car, and a signal indicating a slowing up merely by releasing the accelerator is not required of the driver in the lead.

It was found by the jury that Stanley Kasiewicz was not negligent in turning the Olson automobile to the left on the highway from his direct course. He was therefore traveling in his proper lane of traffic. In taking his foot off the accelerator he was complying with the law which requires a reduction on approaching the crest of a hill. He violated no rule requiring him to keep a lookout to the rear. The evidence established that the brakes were not applied. And the physical

facts show that while traveling on a gradual, uniformly graded incline, releasing of his accelerator could not have resulted in a sudden decrease in speed such as is contemplated by the statute requiring a signal, either by arm or by mechanical device.

The facts show, as the jury found, that James Sullivan was negligent in management and control and in following the Olson car too closely. There were no skid marks on the pavement, and there is no evidence to show that he attempted to stop or to reduce his speed.

In question 3 of the special verdict, the jury found that Kasiewicz was negligent with respect to suddenly decreasing his speed without first giving an appropriate signal; and in question 4 the jury found that such negligence was causal.

There is no evidence to sustain a finding of causal negligence on the part of Kasiewicz. He did not stop suddenly, and he did not cause a sudden slowing of speed contrary to the statute. The oncoming car, seeking to regain its proper lane of travel, without slowing up, came up behind the Olson car. Kasiewicz did not activate his brake for the plain reason that he did not intend to stop or suddenly slow up and did not intend to turn for some distance ahead.

It is considered that the facts established do not support the findings against Stanley Kasiewicz and do show that the real cause of the collision appearing from the evidence must be held to be the negligence of James Sullivan as to management and control and as to following the Olson car too closely up to the time he attempted to pass it.

*By the Court.*—Judgment in favor of Henry Sullivan and against Hartford Accident & Indemnity Company and Violet Olson reversed. That part of the judgment in favor of Robert L. Wodill and Lawrence O. Wodill against Hartford Accident & Indemnity Company and Violet Olson is reversed, and the cross complaint of James Sullivan against Hartford Accident & Indemnity Company and Violet Olson is dis-

missed. Judgment in favor of Robert L. Wodill and Lawrence Wodill against James Sullivan is affirmed.

Cause remanded with directions to vacate the judgments against Violet Olson and Hartford Accident & Indemnity Company and to dismiss the complaints.

BROWN, J. (*dissenting*). I do not think it is a uniform physical fact that reduction of speed is necessarily gradual on an upgrade when the car is in gear and the driver takes his foot off the gas pedal. The jury is the judge of the credibility of the witnesses and the weight to be given their testimony and is likewise the body empowered to draw such inferences as the evidence will reasonably permit. It is as familiar with the behavior of automobiles as judges are. In my opinion the direct testimony of Hendricks that the Cadillac slowed down suddenly, together with Kasiewicz' testimony that he removed his foot from the gas pedal just before the collision and the admitted fact that he intended to come very nearly to a stop not more than 230 feet farther on presents at least a jury question as to whether the Cadillac's deceleration was or was not sudden. It is admitted that no preliminary signal was given. In my view the question was one for the jury and the verdict should stand.

Mr. Justice MARTIN and Mr. Justice BROADFOOT join in this dissent.